**GOLDEN DIPT COMPANY, DIVISION OF DCA FOOD INDUSTRIES, INC.,** Plaintiff-Appellant,

v.

**SYSTEMS ENGINEERING AND MANUFACTURING COMPANY, DIVISION OF KEYSTONE VALVE CORP.,** Defendant-Appellee.

No. 71-1526.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1972.

Decided July 12, 1972.

Rehearing Denied Aug. 9, 1972.

Adolph K. Schwartz, St. Louis, Mo., Sam S. Pessin, Belleville, Ill., for plaintiff-appellant.

John M. Ferguson, Belleville, Ill., for defendant-appellee; Wagner, Conner, Ferguson, Bertrand & Baker, Belleville, Ill., of counsel.

Before SWYGERT, Chief Judge, and KILEY and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

This diversity action for breach of contract was originally commenced in the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois, by the plaintiff, Golden Dipt Company, Division of DCA Food Industries, Inc. (hereinafter, "Golden Dipt"), and was removed to the district court by the defendant, Systems Engineering and Manufacturing Company (hereinafter, "SEMCO"), pursuant to 28 U.S.C. § 1441(a). The cause was tried to the court without a jury, resulting in a

judgment for the defendant, and the plaintiff appealed.

The operative facts are essentially undisputed. Golden Dipt desired in 1968 to have constructed at its Millstadt, Illinois plant a pneumatic bulk flour handling system. Accordingly, bids were received from several interested sellers. Charles Hoskins, an independent manufacturers' representative who sold equipment for several companies, requested of Peter R. Viviano, president of Golden Dipt, an opportunity to secure a bid for such a system from SEMCO, which was one of the companies Hoskins represented.

Thereafter, SEMCO submitted several proposals to Golden Dipt, including a proposal labeled, "Our Proposal No: 7278, Rev. 3," dated August 10, 1968. All of its proposals included a statement of terms which required a twenty-five percent first payment to be submitted with the order. Each proposal also included a group of terms entitled, "General Conditions of Sale." Among those terms were the following:

STATUS OF QUOTED PRICES:

All prices in this Proposal are firm for a period of thirty (30) days from the date of this proposal in the absence of notice of change given to the Purchaser within such period and prior to acceptance of this Proposal by both the Purchaser and the Company [*i. e., SEMCO*] . . . .

\* \* \* \* \* \*

ACCEPTANCE:

Whenever any period of time is specified herein, time shall be deemed to be of the essence of this contract. This Proposal, when approved by the Purchaser and submitted to and accepted by the Company, expresses the entire agreement between the parties. . . . This Proposal is not to be deemed binding upon the Company until accepted on behalf of the Company.

On August 22, 1968, Viviano conversed by telephone with Dennis W. Warneke, Marketing Manager of SEMCO. At that time, Viviano said that his New York headquarters had approved SEMCO's proposal, that SEMCO should "start on it immediately" and that the paperwork would follow. Warneke "expressed his appreciation" and said that "they would start on it immediately."

Warneke then submitted a copy of the proposal to SEMCO's accounting department. On September 3, 1968, the accounting department notified him that there was a mathematical error in the computations and that the total price should be increased approximately $30,000. Warneke telephoned Viviano on the same day and told him that the price would have to be adjusted upward. Viviano told Warneke that he regarded the proposal at the previous price as having been made a firm contract, and Warneke stated that SEMCO would not perform without the additional charge. Viviano stated that on September 3, 1968, he caused a check in the amount of $45,000 to be drawn to the order of SEMCO and executed and dated the proposal on behalf of Golden Dipt. However, he never transmitted the check or the signed proposal to SEMCO. Warneke confirmed the price change upward in the amount of $31,795 by letter dated September 4, 1968.

Upon SEMCO's refusal to perform at the original price of $198,564, Golden Dipt let the contract on September 6 to a theretofore unsuccessful bidder at a cost of $215,534.43, and this lawsuit followed. The sole question raised by this appeal is whether a contract ever came into existence between the parties. We hold that no contract was created.

■ Unquestionably, the proposal submitted by the defendant was an offer to contract. We thus turn to the crucial question of whether the offer was validly accepted by the plaintiff. It is clear that an offeror may, by the terms of his offer, restrict the mode of acceptance. As Professor Corbin has stated the principle:

The offeror creates the power of acceptance; and he has full control over the character and extent of the power

that he creates. He can prescribe a single and exclusive mode of acceptance. It makes no difference how unreasonable or difficult the prescribed mode may be, if the offeror clearly expresses, in the terms of the communicated offer itself, his intention to exclude all other modes of acceptance. 1 A. Corbin, Contracts § 88 at 373 (1963). *Accord,* 1 S. Williston, A Treatise on the Law of Contracts § 76 (3d ed., Jaeger, 1957); Restatement of Contracts § 61 (1932).

Illinois case law (the applicability of which is not disputed) adheres fully to the foregoing principles. *E. g.,* Brook v. Oberlander, 49 Ill.App.2d 312, 199 N.E. 2d 613 (1st Dist.1964); Brophy v. Joliet, 14 Ill.App.2d 443, 144 N.E.2d 816 (2d Dist.1957).

We believe that the language of the proposal clearly establishes the requirement by defendant of an exclusive mode by which plaintiff could accept the offer. That mode was expressly stated in the requirement that a twenty-five percent downpayment accompany the placement of an order and the statements under the title "Acceptance" which provided: "This Proposal, *when approved by the Purchaser and submitted and accepted by the Company,* expresses the entire agreement between the parties." Those provisions undoubtedly require that acceptance be in the form of the delivery of a copy of the proposal signed by the plaintiff's authorized agent together with a downpayment of twenty-five percent of the purchase price.

It is also clear from the facts described above that plaintiff never accepted the offer, for neither the signed copy of the proposal nor the twenty-five percent downpayment were ever delivered to the defendant. Plaintiff argues that the exclusive mode of acceptance, should we determine there was one, was met because Viviano signed the proposal and drew a check for $45,000 prior to notification of the change by Warneke. Even if the drawing of a check in the amount of a twenty-five percent down-

payment and the signing of the proposal by Viviano would constitute acceptance without delivery of the documents to defendant, it is clear that plaintiff did not comply with the prescribed mode of acceptance in any event. That is so because the proposal's requirement of a downpayment of twenty-five percent of the proposed price was not met—twenty-five percent of the original price of $198,564 would have been $49,641, not $45,000 which is the amount for which Viviano had the purported downpayment check drawn.

We conclude, therefore, as did the district court, that the offer stated an exclusive mode by which it could be accepted, that the plaintiff did not accept the offer in the exclusive manner it authorized, and that, consequently, no contract was ever formed between the parties.

The judgment of the district court is affirmed.