SPANISH OAKS, INC., AND ROBERT A. WEIGEL, APPELLANTS
AND CROSS-APPELLEES, V. HY-VEE, INC., ET AL.,
APPELLEES AND CROSS-APPELLANTS.
655 N.W.2d 390

Filed January 17, 2003. No. S-02-012.

Daniel E. Klaus and Carl. J. Sjulin, of Rembolt, Ludtke & Berger, L.L.P., for appellants.

Robert T. Grimit and David D. Zwart, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

Spanish Oaks, Inc., is the owner in fee simple of a 7-acre parcel of real property located in Lincoln, Nebraska. Hy-Vee, Inc., is the current lessee of the property. Spanish Oaks, Inc., and its sole stockholder, Robert A. Weigel (collectively Spanish Oaks) seek a declaratory judgment regarding (1) the terms of the lease between Spanish Oaks and Hy-Vee and (2) the validity of a restrictive covenant contained in a sublease from Hy-Vee to Ocho Properties, L.L.C. (Ocho).

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

The original ground lease of this 7-acre property was executed in 1978. Briar West, Inc., leased the property to Commerce Development Associates. The ground lease provided for a 25-year term, with fixed annual rental payments during the base term. When the base term expires, the lessee may extend the ground lease for six periods of 5 years each, with the annual rent to be adjusted at the beginning of each option period, generally based on the assessed value of the property.

The original tenant, Commerce Development Associates, assigned its interest in the ground lease to Safeway, which, in 1982, assigned that interest to Hy-Vee. Hy-Vee took possession of the then-undeveloped property and commenced construction of a building to operate as a supermarket. The fee simple estate was later purchased by Spanish Oaks, after construction of Hy-Vee's supermarket building had commenced. Weigel testified that he reviewed the ground lease prior to the purchase of the property. The Hy-Vee store opened in 1985. In 1986, Hy-Vee sublet a portion of the premises to the Lerner Company (Lerner); Lerner, in turn, sub-sublet those premises and is the landlord for other retail tenants..

Spanish Oaks is a real estate holding development corporation, and Weigel is its sole stockholder and president. Weigel practiced law for several years specializing in commercial real estate and then became involved in commercial real estate development;

Weigel (through different business entities) owns several shopping centers, and the tenants of these centers include grocery stores and other national stores.

Hy-Vee subsequently ceased to operate a supermarket on the premises, opening a new, larger supermarket nearby. In 1998, Hy-Vee subleased its former grocery store and parking lot to Ocho and sold its improvements on the property to Ocho. The Hy-Vee/Ocho sublease contains a use restriction that permits the sublet premises to be used for retail purposes so long as such purposes do not include a mass-merchandise or discount store operation similar to Wal-Mart, Kmart, Target, grocery stores, or stores engaged primarily in the consumer sale of pharmaceuticals. Ocho also sub-sublet its portion of the premises; at the time of trial, a World Gym was operated on the premises, as well as a Burger King.

## 2. Procedural Background

Spanish Oaks sought a declaratory judgment in the district court regarding the use restriction in the Hy-Vee/Ocho sublease and the rent adjustment provision of the ground lease. Spanish Oaks alleged that the use restriction should be voided because it violates the duty of good faith and fair dealing owed by Hy-Vee to Spanish Oaks, it violates Hy-Vee's duty to develop the property for the mutual benefit of both the landlord and tenant, and it is a restraint on alienation and violates public policy. Spanish Oaks also alleged that the ground lease, which caps the annual rent on the premises at $90,000 or "thirty percent (30%) of Tenant's annual gross rental receipts from Tenant's subleases, which ever is greater," should be construed to refer not to Hy-Vee's subleases to Ocho and Lerner, but to Ocho and Lerner's sub-subleases to their sub-sublessees.

The district court rejected Spanish Oaks' arguments. The district court concluded that the ground lease was unambiguous, that Hy-Vee was the "[t]enant" of the ground lease, and that the plain language of the contract capped the rent adjustment based only on Hy-Vee's subleases. The district court also determined that the ground lease provided Hy-Vee broad discretion to use the premises as it saw fit and that the use restriction of the Hy-Vee/Ocho sublease was a valid exercise of Hy-Vee's authority.

The district court also noted, in dicta, that there appeared to be a dispute among the parties about when the rent adjustments for the option periods of the ground lease were to go into effect. The district court stated that "[t]he parties have not requested in the pleadings that the court determine when the original lease expires or when the rent adjustments take effect. Therefore, the court does not resolve this dispute." An examination of the pleadings, pretrial memoranda, and pretrial order reveals no indication that the issue of the expiration date of the base term of the ground lease was ever presented to the district court.

## III. ASSIGNMENTS OF ERROR

Spanish Oaks assigns, summarized and restated, that the district court erred in finding (1) that the use restriction of the Hy-Vee/Ocho sublease is valid and enforceable and (2) that the rent adjustment provision of the ground lease was unambiguous and that the term "subleases" does not refer to the subtenants actually occupying the property.

On cross-appeal, Hy-Vee assigns, as restated, that the district court erred in not determining the date of the first rent adjustment and the termination date of the ground lease.

Ocho and Lerner, as appellees, did not file briefs, but have filed statements concurring with the brief filed by Hy-Vee.

## IV. STANDARD OF REVIEW

An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *Lake Arrowhead, Inc. v. Jolliffe*, 263 Neb. 354, 639 N.W.2d 905 (2002). When a dispute sounds in contract, the action is to be treated as one at law. *Nebraska Pub. Emp. v. City of Omaha*, 247 Neb. 468, 528 N.W.2d 297 (1995).

The question of a party's good faith in the performance of a contract is a question of fact. *Strategic Staff Mgmt. v. Roseland*, 260 Neb. 682, 619 N.W.2d 230 (2000). Determinations of factual issues in a declaratory judgment action treated as an action at law will not be disturbed on appeal unless they are clearly wrong. See *Woodmen of the World Life Ins. Soc. v. Yelich*, 250 Neb. 345, 549 N.W.2d 172 (1996).

■■■ The meaning of a contract, and whether a contract is ambiguous, are questions of law. See, *Kosmicki v. State*, 264 Neb. 887, 652 N.W.2d 883 (2002); *Malone v. American Bus. Info.*, 264 Neb. 127, 647 N.W.2d 569 (2002). The determination of whether a contract violates public policy is a question of law. *American Fam. Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 648 N.W.2d 769 (2002). In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independently of the conclusion reached by the trial court. *DLH, Inc. v. Lancaster Cty. Bd. of Comrs.*, 264 Neb. 358, 648 N.W.2d 277 (2002).

## V. ANALYSIS

### 1. EXCLUSION CLAUSE

#### (a) Standing

■■ We first note that there is some question whether Spanish Oaks has standing to challenge the use restriction in the Hy-Vee/Ocho sublease. The general rule is that only a party (actual or alleged) to a contract can challenge its validity. *In re Vic Supply Co., Inc.*, 227 F.3d 928 (7th Cir. 2000). "Obviously, the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract." *Id.* at 931.

In this case, however, while Spanish Oaks is not a party to the Hy-Vee/Ocho sublease, Spanish Oaks has standing to challenge the use restriction in the sublease. Spanish Oaks argues that the use restriction constitutes a breach of the covenant of good faith and fair dealing implied by the ground lease; thus, Spanish Oaks is alleging a breach of the ground lease, to which it is a party. Spanish Oaks also claims that the sublease creates a restraint on alienation and that as the fee simple owner of the property, it has standing to raise this claim.

#### (b) Public Policy

■ Spanish Oaks argues that the use restriction is a restraint on alienation that is void because it violates public policy. However, it is a well-established general rule that the parties to a lease may, by express provisions, restrict the uses to which the demised premises may be put, so long as the restriction is

reasonable and not contrary to public policy, and a covenant binding the lessee not to carry on a particular business on the leased premises is binding and enforceable. See, e.g., *Vermont Nat. Bank v. Chittenden Trust Co.*, 143 Vt. 257, 465 A.2d 284 (1983); *Brookings Mall, Inc. v. Cpt. Ahab's, Ltd.*, 300 N.W.2d 259 (S.D. 1980); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243 (1979); *Elida, Inc. v. Harmor Realty Corporation*, 177 Conn. 218, 413 A.2d 1226 (1979); *Tullier v. Tanson Enterprises, Inc.*, 367 So. 2d 773 (La. 1979); *Pitts v. Housing Auth.*, 160 Ohio St. 129, 113 N.E.2d 869 (1953); *Neiman-Marcus Company v. Hexter*, 412 S.W.2d 915 (Tex. Civ. App. 1967). See, generally, 42 Am. Jur. 2d *Landlord and Tenant* § 505 (1995 & Supp. 2002). This court so held in *Herpolsheimer v. Funke*, 1 Neb. (Unoff.) 304, 95 N.W. 687 (1901). Cf. *Wittenberg v. Mollyneaux*, 60 Neb. 583, 83 N.W. 842 (1900) (partial restraints upon exercise of business, trade, or profession are reasonable when ancillary to purchase of property, made in good faith, and necessary to afford fair protection to purchaser).

Spanish Oaks contends that the use restriction is against public policy because it is a restraint on alienation. Spanish Oaks adduced evidence generally indicating that the use restriction depressed the value of Spanish Oaks' fee simple estate by reducing the income-generating potential of the property to the fee simple owner. Spanish Oaks relies on this court's statement, first made in *Cast v. National Bank of Commerce T. & S. Assn.*, 186 Neb. 385, 391, 183 N.W.2d 485, 490 (1971), that " '[a]ny provision in a deed, will, contract, or other legal instrument which, if valid, would tend to impair the marketability of property, is a restraint on alienation.' " Accord, *State v. Union Pacific RR. Co.*, 241 Neb. 675, 490 N.W.2d 461 (1992), *modified* 242 Neb. 97, 490 N.W.2d 461; *Newman v. Hinky Dinky*, 229 Neb. 382, 427 N.W.2d 50 (1988) (in dicta).

However, this court later criticized *Cast, supra*, in *Occidental Sav. & Loan Assn. v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (1980). In *Venco Partnership*, the appellant argued that a "due on sale" clause in a mortgage was void as an indirect restraint on alienation, because the possibility of acceleration of the mortgage might impair the owner from being able to sell the

property as he or she wished. We rejected the appellant's reliance on our holding in *Cast*, stating:

> Whatever an indirect restraint on alienation as envisioned by us in *Cast* may be, a "due on sale" clause in a mortgage does not fall within that category. We perhaps were overly generous in our statement in *Cast* that "[a]*ny provision* . . . which, if valid, would tend to impair the marketability of property, is a restraint on alienation." *Id.* . . . [S]ome covenants may impair the marketability of property and yet not be restraints on alienation, direct or indirect, as that concept is known in the law. *As an example, a covenant in a deed that requires the dedication of property solely to residential purposes is not a restraint on alienation even if the owner could sell the property at a higher price for commercial purposes.* The most that need be said about *Cast* is that the restriction in question affected the validity of title and totally precluded the fee title owner from transferring title for a period of 25 years. There is no similarity between the language of the will in the *Cast* case and a common "due on sale" clause in a mortgage.
>
> The difficulty in attempting to determine the validity of a contract based upon some notion of an indirect restraint on alienation and a concept of "practical inalienability" is that there is no framework within which a court may operate. Parties to a contract can never know, absent litigation, whether the contract is valid or not. Such a result is undesirable and should be avoided if possible.

(Emphasis supplied.) *Venco Partnership*, 206 Neb. at 474-75, 293 N.W.2d at 846. See, also, *Falls City v. Missouri Pacific Railroad Company*, 453 F.2d 771 (8th Cir. 1971) (interpreting *Cast, supra*, as precluding unreasonable limitations on number of persons to whom property can be sold, but not conditions on use of property). In *Venco Partnership, supra*, we criticized the broad language of our prior holding in *Cast, supra*, distinguished it factually, and clearly stated that "not every impediment to a sale is a restraint on alienation, let alone contrary to public policy." *Venco Partnership*, 206 Neb. at 473, 293 N.W.2d at 845.

At worst, the use restriction in the Hy-Vee/Ocho sublease could be described as an indirect, practical restraint on

alienation, as opposed to a direct restraint. A direct restraint on alienation is a provision in a deed, will, contract, or other instrument which, by its express terms, or by implication of fact, purports to prohibit or penalize the exercise of the power of alienation. See, e.g., *Carma Developers v. Marathon Dev. Cal.*, 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992); *Pritchett v. Turner*, 437 So. 2d 104 (Ala. 1983). See, generally, Michael D. Kirby, *Restraints on Alienation: Placing a 13th Century Doctrine in 21st Century Perspective*, 40 Baylor L. Rev. 413 (1988). An indirect restraint on alienation arises when an attempt is made to accomplish some purpose other than the restraint of alienability, but with the incidental result that the instrument, if valid, would restrain practical alienability. See, *Carma Developers, supra*; *Pritchett, supra*; *Redd v. Western Sav. & Loan Co.*, 646 P.2d 761 (Utah 1982); *Lipps v. First American Serv. Corp.*, 223 Va. 131, 286 S.E.2d 215 (1982); *Crockett v. Savings & Loan Assoc.*, 289 N.C. 620, 224 S.E.2d 580 (1976).

Indirect restraints historically have been restricted by the rule against perpetuities and related rules and have not been as harshly struck down as the classical direct restraints. *Crockett, supra.* Courts generally have upheld and enforced such nonclassical restraints if they are found reasonably necessary to protect a justifiable or legitimate interest of the parties. See *Redd, supra.* Cf. Restatement (Third) of Property: Servitudes § 3.5 at 461 (2000) ("[a]n otherwise valid servitude is valid even if it indirectly restrains alienation by limiting the use that can be made of property, by reducing the amount realizable by the owner on sale or other transfer of the property . . .").

This court's decision in *Occidental Sav. & Loan Assn. v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (1980), reflects application of the foregoing principles. In *Venco Partnership*, 206 Neb. at 477, 293 N.W.2d at 847, we specifically rejected the notion that an indirect, practical restraint on alienation is found simply because a "market hindrance" may make buyers less willing to purchase property at a premium. Despite this court's subsequent references to the disapproved language of *Cast v. National Bank of Commerce T. & S. Assn.*, 186 Neb. 385, 183 N.W.2d 485 (1971), see, *State v. Union Pacific RR. Co.*, 241 Neb. 675, 490 N.W.2d 461 (1992), *modified* 242 Neb. 97, 490 N.W.2d

461, and *Newman v. Hinky Dinky*, 229 Neb. 382, 427 N.W.2d 50 (1988) (in dicta), *Venco Partnership, supra*, correctly sets forth and applies the law regarding indirect restraints on alienation.

We now apply those principles to the instant case. Pursuant to *Venco Partnership*, the threshold question is not whether an indirect restraint on alienation is reasonable, but whether the challenged instrument is a restraint on alienation at all. We conclude that, even assuming that the use restriction at issue in this case creates a practical impairment to the marketability of the property, it is not an indirect restraint on alienation. Hy-Vee cannot restrict or prohibit the sale of Spanish Oaks' interest in the property, and Spanish Oaks is free to sell or hold the property as it sees fit. Despite a possible reduction in market price, Spanish Oaks still has both the legal and practical ability to alienate its interest in the property. This situation does not resemble a restraint on alienation of the kind that courts have generally refused to uphold and enforce. Compare *Rich, Rich & Nance v. Carolina Const. Corp.*, 355 N.C. 190, 558 S.E.2d 77 (2002).

Spanish Oaks complains not about a restriction on its ability to sell its property, but about the price it will receive because it is subject to the ground lease and subleases. Compare *Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837 (8th Cir. 1975). The difficulty with this complaint is that many transactions, instruments, and encumbrances can arguably reduce the market value of property. Were we to accept Spanish Oaks' argument, for instance, the ground lease might be voidable, as the marketability of the property would certainly be greater if Spanish Oaks' fee simple estate was unencumbered by Hy-Vee's leasehold. "Certainly courts should not get caught in that thicket." *Venco Partnership*, 206 Neb. at 478, 293 N.W.2d at 848.

Even assuming that the potential market value of Spanish Oaks' fee simple interest is in some way diminished by the presence of the use restriction, that does not make the use restriction an indirect restraint on alienation as that concept is understood in the law. The contention that the use restriction constitutes an unreasonable restraint on alienation is without merit.

### (c) Good Faith and Fair Dealing

 Spanish Oaks also contends that the use restriction of the Hy-Vee/Ocho sublease breaches the implied duty of good faith and fair dealing owed by Hy-Vee to Spanish Oaks by virtue of the ground lease. The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002). See, also, Restatement (Second) of Contracts § 205 (1981); Steven J. Burton & Eric G. Andersen, Contractual Good Faith (1995).

 However, the nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party. *Dunfee v. Baskin-Robbins, Inc.*, 221 Mont. 447, 720 P.2d 1148 (1986), cited with approval, *Cimino v. FirsTier Bank*, 247 Neb. 797, 530 N.W.2d 606 (1995). A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract. See *Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 9 P.3d 1204 (2000). The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. *Carma Developers v. Marathon Dev. Cal.*, 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992). The implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose. *Id.*

In this case, then, the appropriate inquiry is whether the existence of the use restriction in the Hy-Vee/Ocho sublease exceeds the justifiable expectations of the parties to the ground lease and violates, nullifies, or significantly impairs Spanish Oaks' benefit of the contract. As noted by the district court, the ground lease contains no restrictions on Hy-Vee's use of the premises and permits Hy-Vee to "sublet all or any portion of the Premises or the improvements thereon without obtaining the consent of the Landlord." The parties to the ground lease could have included

express provisions governing the tenant's use or subletting of the property, yet chose not to do so. The parties obviously contemplated that the tenant might sublet the premises, yet no provision was made for use restrictions in the subleases despite the commercial prevalence of such restrictions in shopping center leases. See, generally, Annot., 1 A.L.R.4th 942 (1980). Nor was there evidence to suggest that Hy-Vee acted in bad faith to deliberately interfere with Spanish Oaks' benefits under the ground lease; rather, it is apparent that Hy-Vee's inclusion of the use restriction in its subleases is intended to protect Hy-Vee's commercial interests, and any effect on Spanish Oaks is incidental.

The evidence also conflicts regarding the degree to which Spanish Oaks has been deprived of the benefit of the ground lease by the existence of the use restriction. Spanish Oaks does not contend that since acquiring the property, Spanish Oaks has not received the rent payments specified for the base term of the ground lease. Hy-Vee also adduced evidence that the structure on the property was not large enough to accommodate the retailers that Spanish Oaks contended would be ideal for the property, such as Kmart, Target, or ShopKo. Hy-Vee's vice president testified that Hy-Vee moved to its new location because it was unable to expand its previous store on the property to the size Hy-Vee felt was necessary to be competitive.

Spanish Oaks' expert witness also admitted that several other potential retail tenants for the property would not be precluded from locating there by the terms of the use restriction: restaurants, Hobby Lobby, office supply stores such as Office Max or Office Depot, hardware stores such as Westlake Hardware, clothing stores such as Kohl's, Best Buy, or large bookstores such as Barnes & Noble. The managing partner of Ocho testified that the use restriction had not negatively affected the income stream from the property. Thus, despite Spanish Oaks' contention that the use restriction "destroys" the shopping center, the evidence does not show that the use restriction completely deprives Spanish Oaks of the benefits of the ground lease.

Given these circumstances, we cannot say that the district court was clearly wrong in determining that Hy-Vee did not breach the implied covenant of good faith and fair dealing contained in the ground lease. The evidence supports the conclusions that the use

restriction does not violate the reasonable expectations of the original parties to the ground lease and that Hy-Vee has not violated, nullified, or significantly impaired any of Spanish Oaks' benefits under the ground lease. Spanish Oaks' dissatisfaction with the express terms of the ground lease is insufficient to prove that Hy-Vee has acted unfairly or in bad faith.

In arguing to the contrary, Spanish Oaks relies on *George v. Jones*, 168 Neb. 149, 95 N.W.2d 609 (1959). In that case, the lessor sought forfeiture of a mineral lease where the rent was based on the amount of gravel extracted from the property, but the lessee did not work the land with ordinary diligence. We held that where rent under a mineral or mining lease is based on a royalty on the product of the lease, there is an implied covenant on the lessee's part to work the mine with ordinary diligence, so that the lessor may secure the actual consideration for the lease. *Id.* While *George* was analyzed in the specific context of a mineral lease, it is evident that the principles at work in *George* make that case a specific example of the broader covenant of good faith and fair dealing discussed above. Spanish Oaks argues that *George* requires Hy-Vee to develop the premises devised by the ground lease for the mutual benefit of the tenant and landlord.

However, *George, supra*, is readily distinguishable, as noted by the district court, in that the rent under the ground lease in this case is not based on a percentage or royalty, as was the lease in *George*. Even in cases involving commercial percentage leases, it has generally been held that actions which reduce the actual rent received by the lessor do not violate the covenant of good faith and fair dealing where the lessee did not act to intentionally bring down gross receipts at the leased premises, but instead acted for reasonable commercial purposes. See, generally, Steven J. Burton & Eric G. Andersen, Contractual Good Faith § 2.3.3 (1995). The determinative factor in *George, supra*, was that the lessor in that case was wholly deprived of the consideration bargained for under the lease. As noted above, no such circumstance is presented in this case. *George* does not support the position advanced by Spanish Oaks.

Spanish Oaks also argues, briefly, that the use restriction violates the express terms of the ground lease because the ground lease contemplates the development of a " 'shopping center,' "

and "one cannot 'shop' for anything at a World Gym [or] Burger King." Brief for appellants at 22. Even assuming, for the sake of argument, that Spanish Oaks' interpretation of the term "shopping center" is correct, Spanish Oaks' argument has no relevance to the use restriction, which does not compel the presence of World Gym or Burger King. Rather, as demonstrated by the examples set forth above, the use restriction precludes certain particular kinds of retail activity, but does not bar all businesses at which a consumer could "shop" within Spanish Oaks' suggested understanding of the term.

 Spanish Oaks' arguments regarding the use restriction are without merit. The district court did not err in concluding that the use restriction in the Hy-Vee/Ocho sublease is not void for any of the reasons suggested by Spanish Oaks. The district court also concluded that Spanish Oaks was estopped from challenging the use restriction; given our resolution of the other issues presented, we do not reach Spanish Oaks' claims of error regarding the district court's estoppel determination. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Rush v. Wilder*, 263 Neb. 910, 644 N.W.2d 151 (2002).

## 2. RENT ADJUSTMENT PROVISION

As noted previously, the ground lease provides for several extension periods and also provides for adjustment of the annual rent for each extension period based on a percentage of the fair market value of the premises. However, the ground lease also provides in relevant part:

> In no event shall the annual rent be adjusted below Sixty Thousand Dollars ($60,000.00) per year, and in no event shall the annual rent be adjusted above Ninety Thousand Dollars ($90,000.00) per year or *thirty per cent (30%) of Tenant's annual gross rental receipts from Tenant's subleases*, which ever is greater.

(Emphasis supplied.) Spanish Oaks argues that this provision is ambiguous and should be construed to refer to the sub-subleases between Hy-Vee's sublessees and the tenants who actually occupy the premises.

To this end, Spanish Oaks adduced evidence generally indicating that when the ground lease was executed, the original

parties to the ground lease expected there to be only one level of subleases, i.e., that the original lessee of the premises would sublease the premises to a retail occupant. Thus, argues Spanish Oaks, the above-quoted language of the rent adjustment provision was intended to limit the annual rent under the ground lease based on the rental receipts from the occupying tenants of the property, i.e., the businesses that have sublet the premises from Ocho and Lerner.

The district court, however, did not consider Spanish Oaks' parol evidence, as the district court determined that the rent adjustment provision is unambiguous. Extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous. *McDonald's Corp. v. Goler*, 251 Neb. 934, 560 N.W.2d 458 (1997). When a contract is unambiguous, the intentions of the parties must be determined from the contract itself. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Malone v. American Bus. Info.*, 264 Neb. 127, 647 N.W.2d 569 (2002).

In this case, however, the contractual provision at issue is susceptible to only one reasonable meaning. It is well-established that an assignee stands in the shoes of the assignor and is bound by the terms of the contract to the same extent as the assignor. *Vowers & Sons, Inc. v. Strasheim*, 248 Neb. 699, 538 N.W.2d 756 (1995). The assignment of a lease places the assignee in the same relationship toward the lessor as was occupied by the lessee. See *Beltner v. Carlson*, 153 Neb. 797, 46 N.W.2d 153 (1951). Thus, the current parties to the lease, Spanish Oaks and Hy-Vee, are respectively the "Landlord" and "Tenant" described in the ground lease. The "Tenant's annual gross rental receipts from Tenant's subleases" can refer only to Hy-Vee's annual gross rental receipts from Hy-Vee's subleases, which are currently to Ocho and Lerner.

A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Ruble, supra*. Spanish Oaks' extrinsic evidence cannot be used to create ambiguity where the terms of the contract are clear and unambiguous. Although a

party may in retrospect be dissatisfied with a bargained-for provision, an appellate court will not rewrite a contract to provide terms contrary to those which are expressed. *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002). The district court correctly determined that the ground lease is unambiguous and that the "Tenant's annual gross rental receipts from Tenant's subleases" refer to Hy-Vee's subleases with its sublessees, Ocho and Lerner. Spanish Oaks' assignments of error to the contrary are without merit.

### 3. CROSS-APPEAL

As previously mentioned, in its order, the district court noted a dispute among the parties about when the original term of the ground lease was to expire and when the rent adjustments for the option periods of the ground lease were to go into effect, but the district court did not resolve that issue because it was not presented by the pleadings. On cross-appeal, Hy-Vee argues that the district court erred by abstaining on the issue.

Hy-Vee's basic argument is that the district court should have resolved this issue in order to avoid further litigation and promote judicial economy. Hy-Vee contends that "[i]t does little good for the Court to resolve the issue regarding calculating the rent adjustment without deciding when the first rent adjustment will occur." Brief for appellee on cross-appeal at 37.

However, Hy-Vee does not contest the district court's conclusion that this issue was not presented to the district court through the pleadings, and our examination of the record reveals no indication in the pleadings, pretrial memoranda, or pretrial order that this issue was ever presented to the district court for disposition. In fact, there is little indication that the parties were aware of the discrepancy in their positions until it was called to their attention by the district court.

A pleading has two purposes: (1) to eliminate from consideration contentions which have no legal significance and (2) to guide the parties and the court in the conduct of cases. *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996). Pleadings frame the issues upon which the cause is to be tried and advise the adversary as to what the adversary must meet. *Bakody Homes & Dev. v. City of Omaha*, 246 Neb. 1, 516 N.W.2d 244

(1994). The issues in a given case will be limited to those which are pled. *Wilcox v. City of McCook*, 262 Neb. 696, 634 N.W.2d 486 (2001).

While we recognize that judicial efficiency might be promoted if courts were to, sua sponte, determine questions raised by the facts but not presented in the pleadings, that efficiency would come at the expense of due process. Hy-Vee argues, in essence, that the district court erred by not deciding an issue of which the parties had no notice, and regarding which they did not have an opportunity to be heard. But see *In re Application No. C-1889*, 264 Neb. 167, 647 N.W.2d 45 (2002) (procedural due process requires that parties whose rights are to be affected are entitled to notice and opportunity to be heard). We conclude that the district court did not err by declining to address an issue that was not pled by the parties or presented to the district court for disposition.

## VI. CONCLUSION

The district court did not err in determining that the use restriction was not a restraint on alienation and was not clearly wrong in finding that the use restriction did not constitute a breach of the covenant of good faith and fair dealing implied in the ground lease. The district court did not err in concluding that the rent adjustment provision was unambiguous or in declining to address the issue of when the rent adjustment provision becomes effective. For these reasons, we affirm the judgment of the district court.

AFFIRMED.